Mark Mermelstein (SBN: 208005)
mmermelstein@holmesathey.com
Joel M. Athey (SBN: 214399)
joel.athey@holmestaylor.com
**HOLMES, ATHEY, COWAN & MERMELSTEIN LLP**
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017
Tel: (213) 336-5810
Fax: (213) 973-6282

Attorneys for Defendants
MATTHEW ARAGHI and
MICHAEL ARAGHI

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MATTHEW ARAGHI and MICHAEL ARAGHI,<br>Defendants. | **CASE NO. 2:24-CR-00758-WLH-1**<br>**CASE NO. 2:24-CR-00758-WLH-2**<br><br>The Honorable Wesley L. Hsu<br><br>**DEFENDANTS MATTHEW AND MICHAEL ARAGHI'S SENTENCING MEMORANDUM**<br><br>*(Declaration of Joel M. Athey and Related Exhibits Filed Concurrently Herewith)*<br><br>Sentencing Date: July 11, 2025<br>Sentencing Time: 10:30 a.m.<br>Courtroom: 9B |

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

# TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION .......... 1

II. THE ARAGHIS' BACKGROUND .......... 3

A. Childhood, Emigration To The United States, And Education .......... 3

B. The Araghis' Tight-Knit Family Is the Bedrock Of Their Lives .......... 5

1. The Araghis' Parents Are Elderly Cancer Survivors Who Are Disabled And Require Significant Care Provided By The Araghis .......... 5

2. Matthew Araghi .......... 6

3. Michael Araghi .......... 7

III. THE ARAGHIS' PARTICIPATION IN THE OFFENSE .......... 9

A. The Araghis Made A Terrible Mistake .......... 9

B. The Araghis' Life In the Aftermath Of Their Terrible Mistake .......... 10

IV. APPLYING THE ADVISORY SENTENCING GUIDELINE FACTORS TO THE ARAGHIS WARRANTS A NONCUSTODIAL SENTENCE .......... 12

A. The Advisory Sentencing Guidelines & Individualized Sentencing .......... 12

1. The Probation Department Properly Found That The Two-Level Decrease Proscribed By U.S.S.G. § 4C1.1 For "Zero-Point Offenders" Applies To Both Araghis .......... 14

2. The Probation Department's Recommended Downward Variance Functionally Reclassifies The Araghis Into Zone B, Making A Noncustodial Sentence The Proper Result .......... 15

B. The § 3553(a) Factors Support the Recommended Noncustodial Sentence .......... 18

1. Nature and Circumstances of Offense; History and Characteristics of Defendant [§ 3553(a)(1)] .......... 18

a. The Araghis Professional Career, Record Of Community Involvement, Good Moral Character, And Low Risk Of Recidivism All Support A Noncustodial Sentence .......... 18


HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

b. The Araghis' Conduct Was Uncharacteristic .............. 24

c. The Araghis Realized Their Error, Voluntarily Stopped Making Illegal Referrals, And Have Self-Rehabilitated .............. 27

d. The Araghis' Heartfelt Remorse About Their Mistakes .............. 28

2. Need for Sentence to Promote Respect for Law, Provide Just Punishment, Afford Deterrence, Protect the Public, and Provide Needed Correctional Treatment to Defendant [§ 3553(a)(2)] .............. 29

a. The Recommended Noncustodial Sentence Affords Just Punishment While Reflecting Seriousness Of The Offense .............. 29

b. Specific Deterrence Has Already Occurred As The Araghis Are A Very Low Risk To Re-Offend .............. 30

c. Sentencing The Araghis To A Custodial Prison Term Will Not Have A General Deterrence Effect .............. 33

3. The Kinds of Sentences Available [§ 3553(a)(3)-(5)] .............. 34

4. Avoiding Unwarranted Sentencing Disparities [§ 3553(a)(6)] .............. 35

5. The Need to Provide Restitution [§ 3553(a)(7)] .............. 37

C. Additional Sentencing Considerations -- Amount of Loss .............. 37

D. Additional Sentencing Considerations -- The Modest Fine Recommended By Probation Is Unnecessary Given The Large Personal Money Judgment Of Forfeiture .............. 38

V. CONCLUSION .............. 38


HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

# TABLE OF AUTHORITIES

**Page(s)**

## CASES


*Gall v.United States*, 552 U.S. 38 (2007) ................................................ 18, 28, 32

*Pepper v. United States*, 562 U.S. 476 (2011)..................................................... 12

*Rita v. United States*, 551 U.S. 338 (2007) ........................................................ 12

*U.S. v. Baca-Marquez*, 742 F.Supp.3d 1135 (D.N.M. 2024) .............................. 15

*U.S. v. Clown*, No. 3:21-CR-30018-RAL, 2024 WL 1574045 (D.S.D. Apr 11, 2024)..................................................................................................... 14

*U.S. v. Morfin Villa*, No. 1:21-cr-00177-KJM-BAM-1, 2024 WL 3164041 (E.D. Cal. June 25, 2024) .............................................................. 15

*U.S. v. Musgrave*, 647 Fed.Appx. 529 (6th Cir. 2016)........................................ 34

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006).......................... 37

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) .................................... 37

*United States v. Barnes*, 890 F.3d 910 (10th Cir. 2018) ...................................... 19

*United States v. Booker*, 543 U.S. 220 (2005)...................................................... 12

*United States v. Cabrera*, 567 F.Supp.2d 271 (D. Mass. 2008).......................... 31

*United States v. Cole*, 622 F.Supp.2d 632 (N.D. Ohio 2008) ............................. 33

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ......................................... 37

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010).............................. 19, 34

*United States v. Emmenegger*, 329 F.Supp.2d 416 (S.D.N.Y. 2004).................. 37

*United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993)................................ 29

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).............................. 29

*United States v. Germosen*, 473 F.Supp.2d 221 (D. Mass. 2007)........................ 31

*United States v. Hadash*, 408 F.3d 1080 (8th Cir. 2005) .................................... 24

*United States v. Hodges*, 2009 WL 366231 (E.D.N.Y., Feb. 12, 2009) ............. 31

*United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) .................................. 24, 28

*United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008).......................... 19

*United States v. Paul*, 239 F.Appx. 353 (9th Cir. 2007) ..................................... 28


HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

*United States v. Redemann*, 295 F.Supp.2d 887 (E.D. Wis. 2003)...................... 29

*United States v. Ribot*, 97 F.Supp.2d 74 (D. Mass. 1999)................................... 17

*United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) ............................................ 18

*United States v. Samaras*, 390 F.Supp.2d 805 (E.D. Wis. 2005)......................... 30

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008)....................................... 25

*United States v. Watt*, 707 F.Supp.2d 149 (D. Mass. 2010)................................ 24

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008).................................. 18

**STATUTES**

18 U.S.C. § 3553....................................................................................... passim

18 U.S.C. § 3624(b)(1) ........................................................................... 12, 13

28 U.S.C. § 994(j)........................................................................................ 34

**OTHER AUTHORITIES**

Gary Becker, *Crime and Punishment: An Economic Approach,* 76 J. Pol. Econ. 169 (1968)............................................................................... 34

Michael Tonry, "Purposes and Functions of Sentencing," 34 Crime & Just. 1 (2006) ........................................................................................... 33

*Optimal Sentences for White–Collar Criminals,* 17 Am.Crim. L.Rev. 409, 410, 418 (1980) ........................................................................ 34, 37

Publ. L. No. 98-473, § 239, 98 Stat. 1987 (1984) ......................................... 35, 38

U.S.S.G. § 2B1.1 ................................................................................... 17, 37

U.S.S.G. § 4C1.1 .............................................................................. 14, 15, 16

U.S.S.G. § 5C1.1 .............................................................................. 16, 17, 18

U.S.S.G. § 5K2.20 ........................................................................................ 24

U.S.S.G. Manual App'x. C, Amendment 821 ................................................... 14

United States Sentencing Commission, "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" (May 2004) ............................................................................................ 30

Zvi D. Gabbay, "Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime," 8 Cardozo J. Conflict Resol. 421 (2007) ................................................................... 33

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## I. INTRODUCTION

Twin brothers Matthew and Michael Araghi[1] (the "Araghis") appear before the Court as 53-year-old men who are in trouble for the first time in their lives. Starting from a humble background, the Araghis each earned Chiropractic degrees and together built a successful business treating thousands of patients for more than 25 years with care and skill. All of that came crashing down when a podiatrist they knew offered to pay them for patient referrals and they made the serious mistake of agreeing to it.

Although no patients received medically-unnecessary treatments or suffered any injuries, the Araghis know they made a terrible error in judgment, and have spent the last seven years doing something about it. First, they voluntarily stopped making any illegal referrals nearly two years before they knew that they were under investigation. Second, they have not made any illegal referrals in 7½ years, showing that they learned their lesson and are not a danger to ever reoffend. Finally, they immediately pleaded guilty to federal charges when approached by the Government and agreed to repay nearly $525,000 in illegal referral fees.

The Araghis come before the Court with contrite hearts to accept responsibility for their actions. The Probation Department has recommended a downward variance from the Sentencing Guidelines to a custodial sentence of 12 months and 1 day in custody. If the Court were to impose such a sentence, then between "good time" credits and the newly-enacted First Step Act, the Araghis

[1] In the interest of economy for the Court and parties, the Sentencing Memoranda for Matthew Araghi and Michael Araghi are combined into one filing. Both Araghis agreed to a combined Memorandum because their background, family history, profession, and offense conduct are identical. Further, their Plea Agreements are identical, their Pre-Sentence Investigation Reports are nearly identical, and the Probation Department's sentencing recommendation for each is identical. This Memorandum will highlight certain matters specific only to Matthew or only to Michael, such as their family circumstances, but most discussion and information about them are identical and presented jointly for the Court's consideration.

HOLMES, TAYLOR, COWAN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

would have a high likelihood of being released from custody in less than six months. The real question before the Court is whether such a minimal custodial stay is necessary and appropriate in light of the sentencing factors.

As described in further detail below, those close to the Araghis will be inordinately affected by even such a brief incarceration. Their elderly parents, both cancer survivors, depend on the Araghis for daily care as their father is now largely wheelchair bound and their mother cannot manage his care on her own. Moreover, Matthew's 11-year-old son, who has been diagnosed with multiple neuro-divergent conditions, relies on his father's daily presence to maintain his academic, social, and emotional stability and progress. When Matthew is not present for even a day, his son experiences negative consequences. His son's treating specialist opined that even a brief interruption in their daily routines and exercises will create a negative impact on his son and reverse his significant progress. Finally, Michael is a source of ongoing care and support for his wife, who has Type 1 diabetes and received a kidney transplant that requires constant management of her medical condition.

It is respectfully submitted that incarceration is not called for because the Araghis already face significant punishment from their conviction since they have agreed to repay nearly $525,000 (which it will take them years to repay) and risk losing their professional licenses and livelihood. Meanwhile, their risk of reoffending is next to zero, based on (i) historical recidivism data showing that people of their age, education, professional credentials, family stability, and lack of criminal history rarely reoffend, (ii) the fact that it has been 7½ years since they last illegally referred patients; and (iii) the 5½ years of good conduct since their last illegal act without getting into any trouble. Together, these facts can give the Court confidence that specific deterrence has been accomplished as to the Araghis and that general deterrence and the need for just punishment can be accomplished with a noncustodial sentence.

The Araghis respectfully request that the Court sentence them to a

noncustodial sentence (which, in the Court's discretion, might include up to six months of home confinement) to allow them to continue working, caring for their parents, treating their patients, preserving their employees' jobs, allowing Matthew to support the treatment for his son's neuro-divergent condition, and allowing Michael to help with his wife's medical care. Nothing meaningful is accomplished by having the Araghis incarcerated for a few months, but it would have an outsized effect on people who depend on them.

For all of these reasons, the Araghis respectfully submit that a noncustodial sentence (which, in the Court's discretion, might include up to six months of home confinement), three years of Supervised Release, no fine, no restitution, and confirmation of the personal money judgment of forfeiture of $262,400 apiece is appropriate.

## II. THE ARAGHIS' BACKGROUND

### A. Childhood, Emigration To The United States, And Education

The Araghis were born in Tehran, Iran in 1971. Their father, Mansour, was a salesman while their mother, Farideh Panadi, did not work outside the home. They were two of four children and grew up in a tight-knit household. However, life in Iran was very hard for them because of their Jewish faith in a predominantly-Muslim country. (Michael Araghi Pre-Sentence Investigation Report, Dkt. No. 26 ("Dkt. 26"), at ¶ 75; Matthew Araghi Pre-Sentence Investigation Report, Dkt No. 28 ("Dkt. 28"), at ¶ 75). Both Araghis experienced harassment, physical beatings, and ostracization due to their religion. (*Id.*). They were called names daily at school like "dirty Jew" (Dkt. 28, at ¶ 75), followed by groups on the streets looking to pick fights with them (Dkt. 26, at ¶ 75), and demeaned and harshly punished by teachers at their schools (Dkt. 26, at ¶ 75; Dkt. 28, at ¶ 75).

After the fall of the Shah's regime in 1979, things became even harder for their family. In 1988, when the Araghis were 16 years old, their family left behind religious persecution (like vandalization of their temple) and poverty and moved to

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

the United States, living for a brief time with relatives in New York. As with many Iranian emigres who fled the Ayatollah Khomeini's totalitarian regime, the family left Iran with virtually nothing. By 1989, the Araghis had moved again, this time to Los Angeles, where they enrolled as students at Alexander Hamilton High School. With their father as sole provider, the family struggled financially. Determined to help out as best they could, each of the Araghis took on two part-time jobs during high school to help the family stay afloat. (Dkt. 26, at ¶¶ 76, 92; Dkt. 28, at ¶ 76).

After high school, the Araghis began their college education at Santa Monica College in order to become eligible to transfer to a four-year university. (Dkt. 26, ¶ 87; Dkt. 28, ¶ 91). During college, they continued working part-time jobs to make ends meet and help their family. (Dkt. 26, at ¶ 91). In 1992, the Araghis enrolled at Cleveland Chiropractic College in Los Angeles for four years of schooling, after which they each received a Doctor of Chiropractic degree. (Dkt. 26, at ¶ 88; Dkt. 28, at ¶ 92). There, they met David Khani, a classmate and lifelong friend who wrote a letter of support for the Araghis in which he said that the Araghis got to know David, then a virtual stranger, because they noticed he was taking the bus to school and offered to drive him to and from school "without hesitation or expectation." Declaration of Joel M. Athey ("Athey Decl."), filed concurrently herewith, at Exhibit A. As Mr. Khani said, "[t]hat simple act of kindness marked the beginning of a deep and enduring friendship." *Id.*

For the last 29 years, the Araghis have been fully-licensed chiropractors by the California Board of Chiropractic Examiners. (Dkt. 26, at ¶ 89; Dkt. 28, at ¶ 93). In 1998, the Araghis set up their own business, called LAX Physical Medicine. (Dkt. 26, at ¶ 90; Dkt. 28, at ¶ 94). They are self-employed and have co-owned the business together for the last 27 years. *Id.*

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### B. The Araghis' Tight-Knit Family Is the Bedrock Of Their Lives

#### 1. The Araghis' Parents Are Elderly Cancer Survivors Who Are Disabled And Require Significant Care Provided By The Araghis

The Araghis' father, Mansour, is 93 years old. He is a cancer survivor who is now fully disabled and wheelchair bound with limited ability to care for himself. (Dkt. 26, at ¶¶ 71, 73; Dkt. 28, at ¶¶ 71, 81). Mansour Araghi's treating physician, Dr. David Hoffman of Cedars Sinai, provided information to the Probation Department about his current health status. Athey Decl., at Ex. B. Dr. Hoffman wrote as follows:

> Mansour Araghi is a patient under my care. The patient has several hematologic issues that affect his ability to care for self. He requires near total care by his family members. His condition causes fatigue. He has poor balance due to determining health and cannot safely ambulate unsupervised without much assistance by others. He cannot perform basic [activities of daily living] nor manage his medications and physical and other healthcare appointments. Family members must be with him 24 hours 7 days per week.

*Id.*

The Araghis' mother, Farideh Panahi, is 76 years old and is also a cancer survivor who is now disabled. (Dkt. 26, at ¶ 73). Her treating physician, Dr. Arman Hekmati, described her condition as follows:

> [Farideh Panahi] is suffering from multiple chronic medical conditions, including osteoarthritis of the knee, chronic back pain, impaired mobility, and dementia. Due to the severity of these conditions, she is unable to safely perform activities of daily living (ADLs) without the assistance of a family member or caregiver.

Athey Decl., Ex. C. The Araghis provide daily care for their parents who are now largely unable to care for themselves. This includes helping with their medications, taking them to medical appointments, buying their groceries, and providing other care and support, including financial support. (Dkt. 26, at ¶ 73; Dkt. 28, at ¶ 81).

Their care for their parents was described by Sydney Wiseman, who was

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

taken in by Michael's family when she moved to Los Angeles from another country, spent a lot of time with their extended family, and said in a letter of support, "I also know that Michael is deeply involved in caring for his parents, visiting them daily to help them as needed. His father is now wheelchair-bound and his mother needs his help for both of their care. Michael is selfless and dedicated in providing that care and I do not know where his parents would be without him." Athey Decl., Ex. D.

Michael's wife, Ariane, said that Michael "carries the enormous responsibility of taking care of his disabled parents, who rely on him every single day. He handles everything—financially, physically, emotionally. He is the one who goes, comes back, and goes again. He cuts his father's hair and nails every week. He arranges everything they need without ever complaining." Athey Decl., Ex. E.

The Araghis' long-time friend, Dr. Parham Neghdechi, described the Araghis' involvement in caring for their parents:

> [Michael and Mathew are] primary caregivers for their aging parents. Their father is wheelchair-bound and requires constant care. Their mother, who is struggling with her own health, cannot manage alone. Matthew and Michael take turns, adjusting their work schedules to ensure their parents are never without help or support. I know this personally, because Michael reached out to me for medical advice when their father was hospitalized. Their devotion to their family is tireless and deeply moving.

Athey Decl., at Ex. F.

**2. Matthew Araghi**

Matthew Araghi met his wife, Nicole, in 2006 through mutual friends and they married in 2007. (Dkt. 28, at ¶ 79). After multiple miscarriages and fertility struggles, they had twins in 2013, a son and daughter, now aged 11. (*Id.*). In 2016, they had another son, now aged 8. (*Id.*).

When he was in preschool, Matthew's oldest son (whose is not identified by name for privacy reasons but who is referred to herein as "J") was examined and diagnosed with multiple neuro-divergent conditions with co-morbidities. As

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

explained by the family's child development specialist, Dr. Elena Perez:

> [J] experiences significant underlying anxiety and developmental delays. For him, structure, routine, and consistency are essential to his development and well-being. In fact, even switching from spending time with one of his parents to the other can be challenging for him. As a result, he requires significantly more attention and care. Matthew's role in his life is critical for his social and emotional development.

Athey Decl., Ex. G. Dr. Perez explained further Matthew's part in J's development,

> Matthew's role in [J's] life is critical for his social and emotional development. As the male parent in his son's life, Matthew is best able to connect with his son in many areas, including grooming, maturation, puberty, and social/emotional growth. I have witnessed first-hand that Matthew has a remarkable facility for explaining things to his son and easing his ever-present anxiety. Matthew spends more than an hour each night working with his son so that he can achieve developmentally at the same level as his peers. This includes breathing and relaxation exercises that Matthew does with his son daily. Matthew's bond and relationship with his son is critical in being able to do those exercises.

Athey Decl., Ex. G. And when Matthew is not able to spend time with J, the effects manifest quickly. As Dr. Perez explained:

> On the rare occasions when Matthew is not available to spend that hour or more with his son as part of their daily routine, his son starts acting up the following day and experiences other reactions from missing that routine (regression). It is my professional opinion that Matthew's son will regress from the significant progress he has made in addressing his neurodivergent conditions if Matthew is not available to be a daily presence in his life.

Athey Decl., Ex. G.

**3. Michael Araghi**

Michael married his wife, Ariane, in 2004. They have two children, aged 18 and 16. (Dkt. 26, at ¶ 77). Ariane has Type I diabetes and underwent a kidney transplant several years ago. (*Id.*). Ariane wrote a letter of support describing the medical assistance that she needs and receives from Michael:

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

> Since my transplant, I struggle every day to keep things in check. Managing my diabetes, my anti-rejection medications, the frequent appointments—it's a full-time job. Add to that raising kids, keeping up the house, and everything life throws at us, and there are many days I simply can't do it all. That's when Michael steps in without being asked. Sometimes, after a full day of work, he's the one who makes dinner. On the days I'm wiped out from fluctuating blood sugar or side effects from immunosuppressants, he quietly carries the weight I can't. He is my partner in every sense of the word. I need him daily—not just emotionally, but practically, physically, spiritually.

Athey Decl., Ex. E.

The couple's long-time friend, Arye Sasson, described Michael's involvement in Ariane's medical care in a letter of support, saying:

> Through every medical challenge, Michael has stood by her with unwavering strength and tenderness. In addition to her medical team, he is her daily caregiver and her greatest source of support-managing medications, appointments, and emergencies, always with calm and compassion. It is not easy, and yet he handles it with grace and without complaint.

Athey Decl., Ex. H. Ariane's brother, Haimy Mann, who also wrote a letter of support, described Michael's care towards Ariane during her medical challenges:

> When the time came for my sister to move to another country with Michael, it was his reliability and integrity that gave our entire family peace of mind. We knew she would be safe and loved with him. And indeed, he has continued to prove that trust was well-placed — he has been a devoted husband and a deeply loving father.

Athey Decl., Ex. I.

Sydney Wiseman, who lived with Michael's family when she moved to Los Angeles and witnessed their daily interactions, wrote in a letter of support:

> I've seen firsthand how devoted [Michael] is to his wife, constantly checking in on her health and well-being, particularly because she manages diabetes. He is the kind of partner who remembers to ask if she's checked her sugars, who worries about her day, and who never stops trying to make her life easier. That same compassion extends to

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

his children and, generously, to me.

Athey Decl., Ex. D.

## III. THE ARAGHIS' PARTICIPATION IN THE OFFENSE

### A. The Araghis Made A Terrible Mistake

From 1998 (when they opened their chiropractic clinic) until 2015, the Araghis treated thousands of patients without any issues. As part of their normal practice, they referred patients who had other medical conditions to specialists with whom they were familiar. They received no fee for these referrals, which were totally legal and made in an effort to help their patients.

One of the specialists that they referred patients to (without receiving any fee) was a podiatrist who is identified in the Plea Agreements as Co-Conspirator 1 ("CC1"). In early 2015, CC1 approached the Araghis with a proposal to pay them for patient referrals. At the time, the Araghis' were experiencing significant financial pressures in their business, though they know that is no excuse. (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32). Foolishly, they agreed to CC1's suggestion. Between March 2015 and late 2017/early 2018, the Araghis illegally referred patients to CC1 (or other medical providers he was associated with) and were paid in return through various companies they owned or controlled.

This arrangement never sat right with the Araghis and they voluntarily ended it in late 2017/early 2018, before they knew about any Government investigation into their conduct. (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32). After that date, the Araghis never again illegally referred a patient to CC1 or anyone else, nor did they follow up with CC1 to be paid for those patients who they had previously referred but not been paid for. For the last 7½ years, the Araghis have operated their practice in a completely law-abiding way.

However, after not having seen nor heard from CC1 in 1½ years, all of a sudden he showed up again in the Fall of 2019 and said that he wanted to pay the Araghis for patients they had referred to him nearly two years or more before. As it

turns out, CC1 disappeared in early 2018 because he had been arrested and charged in an Information by the Government for his role in a separate scheme to pay for patient referrals of dock workers and longshoremen. After pleading guilty and working with the Government for more than a year (presumably seeking cooperation credit), CC1 was sent in undercover to speak to the Araghis in mid-2019. After ignoring his overtures for several months, the Araghis finally agreed to meet with CC1, and over a period of one month in October and November 2019 (which was surveilled by the Government), CC1 offered to pay for patients they had previously referred. The Araghis went along with CC1 because he was offering to pay them for the prior referrals, but they *did not refer any new patients to him in late 2019*. CC1 ultimately gave them one check in October 2019 that they cashed for $5000 for unpaid referrals. As part of these discussions in late 2019, the Araghis and CC1 also worked up a ham-fisted lease document to make it look like CC1 was paying to rent space from them (a tactic CC1 had previously used in the longshoreman scheme). Ultimately, CC1 gave them other checks they did not cash.

They were approached by the FBI in November 2019. Then they heard nothing until 2024 when they were approached by the Government. They immediately agreed to plead guilty, accepted responsibility for their actions, were told no further cooperation by them was sought by the Government, and agreed to repay nearly $525,000 in illegal referral fees. Notably, there is no allegation that any of the Araghis' patients: (i) received substandard care from them; (ii) received medically-unnecessary treatments from other providers the Araghis referred them too; or (iii) suffered any harm, physically or financially, from the referrals.

**B. The Araghis' Life In the Aftermath Of Their Terrible Mistake**

*Voluntarily Stopped Referring Patients* -- the Araghis realized what a terrible mistake they had made by agreeing to CC1's referral proposal. (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32). The concept never sat right with them. (*Id.*). So when CC1 disappeared in late 2017 or early 2018, they were beyond relieved. And from that

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

point on, they never again referred a patient to anyone in return for a fee. They have simply run their chiropractic clinic and treated their patients, honestly and faithfully, for the last 7½ years.

*Acceptance of Responsibility & Remorse* -- When the Government approached the Araghis in 2024, they immediately agreed to plead guilty and accepted responsibility for their actions. The Government indicated that it was not interested in further cooperation, and ultimately did not charge the Araghis' partner, who is identified in the Plea Agreements as Co-Conspirator 2 ("CC2"). The Araghis agreed to plead guilty and to repay nearly $525,000 as a personal money judgment of forfeiture. Moreover, the Araghis have fully and candidly owned their mistakes and accepted responsibility for their conduct to their family and friends as indicated in many letters of support (Athey Decl., Exs. A, D, E, F, H, I, K, L, O) and in their statements to this Court (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32).

The Araghis realize this is the single greatest mistake they have ever made. (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32). CC1 happened to catch them at a time of financial desperation, but the Araghis know and accept that they made the decision to say yes and become involved (as they told their friends and family and this Court). They know that was wrong, which is why they pleaded guilty and agreed to repay nearly $525,000 that CC1 paid in illegal referral fees, and are now before the Court to accept the consequences. The Araghis cannot undo the past, but they have tried to do something about their mistake, both before and after their arrest by: (i) voluntarily stopping illegal patient referrals 7½ years ago (long before they had any inkling of a Government investigation); (ii) not engaging in any wrongful conduct for more than 5½ years since their last meetings with CC1; and (iii) immediately pleading guilty and agreeing to repay nearly $525,000 as a substantial personal money judgment of forfeiture.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## IV. APPLYING THE ADVISORY SENTENCING GUIDELINE FACTORS TO THE ARAGHIS WARRANTS A NONCUSTODIAL SENTENCE

### A. The Advisory Sentencing Guidelines & Individualized Sentencing

In *United States v. Booker*, 543 U.S. 220, 245 (2005), the Supreme Court held the Sentencing Guidelines should be treated as advisory only. *See also Rita v. United States*, 551 U.S. 338, 364-65 (2007) (Stevens, J. and Ginsburg, J, concurring) ("The [United States Sentencing] Commission has not developed any standards for recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition . . . employment history, lack of guidance as a youth, family ties, or . . . civic, charitable, or public service are not ordinarily considered under the Guidelines. . . . These are, however, matters that § 3553(a) authorizes the sentencing judge to consider."). Sentencing courts may, therefore, consider a wide range of information to ensure the punishment fits the defendant "as he stands before the court on the day of sentencing." *Pepper v. United States*, 562 U.S. 476, 492 (2011).

For the Araghis, the sentencing guidelines and other factors warrant imposition of a noncustodial sentence so they may remain in the community: (i) to provide vital care for their ailing and elderly parents who depend on them for medical challenges, groceries, and daily needs; (ii) for Matthew to provide care for his son who has multiple neuro-divergent conditions, relies on his father for essential stability and support, and demonstrably "back slides" without his father's daily presence; (iii) for Michael to provide care for his wife who is a diabetic and kidney-transplant recipient whose medical challenges she needs Michael's help to navigate; (iv) to continue providing medical care to their hundreds of patients; and (v) to keep their nine employees working.

The United States Department of Probation & Pretrial Services ("Probation") recommends a downward variance from a sentence of 18-24 months to 12 months and 1 day, which pursuant to the "good conduct" credits of 18 U.S.C. § 3624(b)(1),

would result in a sentence of less than 10½ months in custody. Moreover, the newly-enacted First Step Act (Publ. L. No. 115-391) provides additional earned time credits -- that are applied on top of the 18 U.S.C. § 3624(b)(1) "good conduct" credits -- of up to 15 days for each month in approved programming for minimum and low risk offenders (which the Araghis will surely be classified as). It is entirely possible that if sentenced to 12 months and 1 day (as Probation recommends) the Araghis would be eligible for early release after about 5 months of incarceration.

So the question before the Court is whether the sentencing factors justify having the Araghis spend as little as a few months in custody when weighed against the disproportionate impact that time away will have on people who rely on them. It is respectfully submitted that the answer is no and that the Court can take many factors into account in reaching that conclusion.

First, the Araghis voluntarily stopped illegally referring patients long before they knew there was a government investigation, and the Supreme Court has indicated that offenders who "self-rehabilitate" present strong evidence that they are already reformed. Second, they have not illegally referred a patient in more than 7½ years, which provides the Court with ample assurance that no further deterrence is needed to curb their behavior since it has not happened for so long already. Third, they will already experience significant punishment through a personal money judgment of forfeiture of nearly $525,000 and the potential loss of their professional licenses (and by extension, their livelihood). Finally, given the extensive harm that will be caused to their parents, Matthew's son, and Michael's wife, their patients, and their employees if they are gone for even a few months, a noncustodial sentence (which, in the Court's discretion, may include up to six months of home confinement) is appropriate in this case while also satisfying concepts of specific deterrence, general deterrence, respect for the law, just punishment, and no disparities with similarly-situated offenders.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### 1. The Probation Department Properly Found That The Two-Level Decrease Proscribed By U.S.S.G. § 4C1.1 For "Zero-Point Offenders" Applies To Both Araghis

The Araghis' Plea Agreement identifies a base offense level of 20. (Dkt. 9 at ¶ 12 & Dkt. 26 at p 3 [Michael]; Dkt. 8 at ¶ 12 & Dkt. 28 at p 3 [Matthew]). Pursuant to the terms of their Plea Agreement (and confirmed and applied by Probation in the Pre-Sentence Investigation Reports), by accepting responsibility and pleading guilty, the Araghis' total offense level was reduced by three levels from 20 to 17. (Dkt. 9 at ¶ 3(c) & Dkt. 26 at p 3 [Michael]; Dkt. 8 at ¶ 3(c) & Dkt. 28 at p 3 [Matthew]).

The Araghis' sentencing recommendation from Probation then applied a further, 2-level decrease in the Araghis' total offense level from 17 to 15 based on a determination that they were in Criminal History category I, with no prior record of conviction. (Dkt. 25 at p 4 & Dkt. 26 at p 3 [Michael]; Dkt. 27 at p 4 & Dkt. 28 at p 3 [Matthew]). It is respectfully submitted that Probation's determination was appropriate, and that the Court should decrease the Araghis' total offense level by 2 levels from a 17 to a 15 because they qualify for the "zero-point offender" decrease authorized by recent changes to the United States Sentencing Guidelines ("U.S.S.G.") at § 4C1.1.

The U.S.S.G's reason for implementing the "zero-point offender" reduction was that, "[r]ecidivism data analyzed by the Commission shows ... that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." *U.S. v. Clown*, No. 3:21-CR-30018-RAL, 2024 WL 1574045, *2 (D.S.D. Apr 11, 2024) (citing U.S.S.G. Manual App'x. C, Amendment 821, at 242 (U.S.S.G. 2023)). In fact, the United States Sentencing Commission (the "Commission") found the differential between "zero-point offenders" and one-point offenders was "the largest variation of any comparison of offenders within the same Criminal History Category." *Id.*

Accordingly, sentencing courts are directed that they "must decrease a defendant's offense level by 2 if the defendant is in criminal history category I with zero criminal history points" and meets the criteria of U.S.S.G. § 4C1.1. *See U.S. v. Baca-Marquez*, 742 F.Supp.3d 1135, 1145 (D.N.M. 2024) (emphasis added); *see also U.S. v. Morfin Villa*, No. 1:21-cr-00177-KJM-BAM-1, 2024 WL 3164041, *2 (E.D. Cal. June 25, 2024) ("A defendant is entitled to a reduction under the zero-point offender provision if the defendant meets all criteria listed in that section . . .").

Without belaboring a point that does not seem to be in much dispute, it is respectfully submitted that the Court should follow Probation's determination and reduce the Araghis' total offense level by 2 levels from 17 to 15. Probation properly found that none of the aggravating factors of U.S.S.G. § 4C1.1(a) applied to the Araghis' offense. (Dkt. 25 at p 4; Dkt. 27 at p 4). And indeed, that is logical since their offense had nothing to do with terrorism, violence, death or serious bodily injury, a sex offense, a weapons offense, a hate crime, aggravated role in the offense, a criminal enterprise, or any of the other aggravating factors identified in U.S.S.G. § 4C1.1(a). As a result, the Court should begin its analysis with the Araghis' total offense level as 15 (18 to 24 months).

**2. The Probation Department's Recommended Downward Variance Functionally Reclassifies The Araghis Into Zone B, Making A Noncustodial Sentence The Proper Result**

Beyond applying the 2-level decrease for "zero-point offenders," Probation further recommends a downward variance from a sentencing range of 18 to 24 months to a sentence of 12 months and 1 day incarceration. (Dkt. 25 at p 1; Dkt. 27 at p 2). A sentence of that length is normally associated with an offender who is in Zone B on the Sentencing Table.[2] And a defendant who is functionally in Zone B

[2] To be clear, the Araghis are _not_ arguing that Probation had the authority to, or actually sought, to formally reclassify their offense from Zone D to Zone B. Rather, they are pointing out that the _practical effect_ of Probation's recommended downward variance to a sentence of 12 months and 1 day (which could result in an actual custodial sentence of less than 6 months if imposed), is that Probation



HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

opens up different analyses and choices for the Court as it pertains to non-violent, first-time offenders like the Araghis.

U.S.S.G. § 5C1.1(c) states that, in Zone B, the minimum term may be satisfied by a sentence of (1) imprisonment; (2) at least one month of imprisonment and the remainder substituted by community confinement or home detention; or (3) a sentence of probation that includes a combination of community confinement or home detention. Several different analyses may lead the Court to the conclusion that a noncustodial sentence is in this case is appropriate for the Araghis.

➢ U.S.S.G. § 5C1.1 Application Note 10(A) -- Application Note 10(A) of U.S.S.G. § 5C1.1 addresses defendants who received the "zero-point offender" adjustment of U.S.S.G. § 4C1.1 and have an applicable guideline range in Zone B, stating that "a sentence other than a sentence of imprisonment . . . is ***generally appropriate***." U.S.S.G. § 5C1.1, Application Note 10(A) (emphasis added).

Taken together, the practical effect of Probation's (i) application of the "zero-point offender" 2-level decrease and (ii) recommended downward variance to a term of imprisonment of 12 months and 1 day (consistent with Zone B offenders) is that the Araghis are the type of defendant for whom the U.S.S.G. indicated a sentence other than imprisonment was "generally appropriate." Again, the Araghis are *not* arguing that Probation recommended formally converting their offense from Zone D to Zone B (nor could it). But the *practical impact* of Probation's recommended downward variance, on top of the "zero-point offender" reduction, is that Probation is advising the Court to treat the Araghis as if they were Zone B offenders, for whom a noncustodial sentence is "generally appropriate."

➢ U.S.S.G. § 5C1.1 Application Note 10(B) -- Application Note 10(b) of U.S.S.G. § 5C1.1 offers another reasoned basis for the Court to determine that a noncustodial sentence is appropriate. That section states that a "departure to a

recommended a sentence normally associated with a defendant in Zone B.

sentence other than a sentence of imprisonment" may be appropriate if the offender received the "zero-point offender" adjustment and their applicable guideline range "overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." U.S.S.G. § 5C1.1(B). The Araghis meet both criteria because they received the "zero-point offender" adjustment and their offense was not a crime of violence or an "otherwise serious offense" (a term that is not defined in the U.S.S.G. and so leaves the Court significant latitude in interpretation).

Here, it is undisputed that the Araghis did not provide medically-unnecessary services to any patients. (Dkt. 8, at ¶ 10; Dkt. 9, at ¶ 10). Nor is there any claim that any patients were harmed by their offense, either physically or financially. In fact, the Government has never identified any victims of their offense (Dkt. 26, at ¶ 29; Dkt. 28, at ¶ 29), or attempted to quantify any monetary losses by any particular victim. The only harm identified was the money they received from CC1, and the Araghis have agreed to repay nearly $525,000 as a personal money judgment of forfeiture. Moreover, the Araghis voluntarily stopped referring patients to CC1 years before they realized the Government was investigating their conduct. (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32). And they have not stepped wrong in any way for more than 5½ years, which clearly demonstrates that incarceration is not needed for them to "learn a lesson" or because they are a danger to reoffend.

The Court may also consider whether the Araghis' Guidelines sentence "overstates" the seriousness of their offense because it is heavily driven by the "amount of loss" table from U.S.S.G. § 2B1.1. *See United States v. Ribot*, 97 F.Supp.2d 74, 77-78 (D. Mass. 1999) (seven-level downward variance and sentence of six months home detention [despite Guidelines range of 24-30 months that the court noted was driven *mostly by amount of loss*] for first-time offender who contributed meaningfully to community, was a decent and kind person, and expressed remorse and contrition).

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

The Araghis are first-time, white collar, zero-point, offenders whose offense was not a crime of violence or otherwise serious offense and who Probation recommended should receive a downward variance and be incarcerated for less than one year (and likely less than 6 months of actual custody). Under those circumstances, U.S.S.G. § 5C1.1 offers compelling guidance to the Court that the Araghis should instead receive a noncustodial sentence so they can remain in the community to help those who depend on them.

**B. The § 3553(a) Factors Support the Recommended Noncustodial Sentence**

**1. Nature and Circumstances of Offense; History and Characteristics of Defendant [§ 3553(a)(1)]**

§ 3553(a)(1) is a "broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.' " *Gall v. U.S.*, 552 U.S. 38, 50 n.6 (2007). The Court may consider many factors not explicitly identified in the Guidelines, including: the Araghis' history of good moral character, first-time offender status, the non-violent offense, an extremely low risk of recidivism, their age, employment history, family support, education, and post-offense rehabilitation.

**a. The Araghis Professional Career, Record Of Community Involvement, Good Moral Character, And Low Risk Of Recidivism All Support A Noncustodial Sentence**

The Court may consider the Araghis' professional accomplishments, history of community involvement, support to family, and low risk of recidivism as factors in imposing a below-Guidelines sentence, as seen in comparable cases:

- *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) -- upholding probation sentence [despite Guideline range of 41-51 months] for selling more than $1 million of counterfeit cards, where defendant was remorseful, employed, and no longer posed a threat to community;
- *United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008) -- upholding sentence of one day imprisonment (with 12 months at local jail allowing





HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

for work release during the day) for health-care fraud and money laundering [despite Guideline range of 30-37 months] where court considered defendant's strong employment history, clear sense of remorse, family support, and absence of risk to public.

- *United States v. Edwards*, 595 F.3d 1004, 1015 (9th Cir. 2010) -- upholding sentence of probation (with seven months house arrest) for bankruptcy fraud [despite Guideline range of 27-33 months] where District Court found that the defendant was a "totally different person" and the court was "convinced [he] had changed" and would not reoffend;
- *United States v. Barnes*, 890 F.3d 910, 918 (10th Cir. 2018) -- upholding sentence of 24 months [despite Guidelines range of 70-87 months] based in part on the fact that, before his crime, defendant, "led a stable lifestyle and appear[ed] active in his community" and his risk of recidivism was "low to nonexistent and he posed no apparent threat to the community";
- *United States v. Munoz-Nava*, 524 F.3d 1137, 1142-43 (10th Cir. 2008) -- upholding sentence of 12 months and 1 day [despite Guideline range of 46-57 months] based on defendant's personal history and characteristics, including long work record, community support, lack of criminal record, caregiver role to young son, and low recidivism risk.

One of the Court's challenges in arriving at an appropriate sentence is trying to get the measure of people without knowing them personally. One way for the Court to gain insight into the Araghis is by hearing from people who have known them for a long time and can speak to their character. Respectfully submitted with this memorandum are letters from friends, family, and colleagues who have known the Araghis for many years and can speak to who they are. Throughout, the Araghis are consistently described by family, friends, patients, and co-workers as kind men, careful medical professionals, and "straight arrows" who selflessly helped others.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**Community Involvement & Good Moral Character** -- Letters of support from the Araghis' friends, patients, and colleagues demonstrate that for decades they have helped their community, synagogue, patients, and friends. Just a few examples are revelatory:

- Chris Maumalanga, a patient of the Araghis, a former NFL player, and currently a youth and high school football coach, said he referred many players from his teams to the Araghis who "always welcomed them with open arms, providing essential care at no cost." As co-founder of the Tongan American Youth Foundation, Mr. Maumalanga said the Araghis were "instrumental in supporting [underserved] communities by offering their services to youths who often lack access to adequate healthcare." He noted that the Araghis' "dedication to the well-being of their patients and the community is truly remarkable." Athey Decl., at Ex. J.
- The Araghis' friend and chiropractic school colleague, David Khani, described how they responded to his mother's leukemia diagnosis by organizing "a community campaign to register individuals for bone marrow and blood stem cell donation. Their efforts went far beyond offering support; they mobilized people, raised awareness, and brought hope to families like mine." Mr. Khani said their "campaign led to two successful donor matches for other individuals in need. That kind of impact cannot be overstated — and it was done quietly, without any interest in recognition." Athey Decl., at Ex. A.
- Rabbi Yehuda Leib, the Araghis' rabbi of many years, writes that the Araghis are "pillars of our community" and "generous, kind-hearted individuals who have quietly and consistently gone above and beyond to help those in need." Rabbi Leib noted the Araghis' generous contributions to their synagogue over the years -- including donating a very valuable Torah scroll that "brought our community together and []

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

that we will always remember" -- and said they are "always giving with humility and without seeking recognition." He also shared how the Araghis routinely provide free treatments to synagogue members who are struggling physically or financially. Rabbi Leib summed it up by saying, "[t]hese are not isolated acts, but part of a consistent pattern of care and compassion that defines who they are" and that "[t]heir moral compass, deep family bonds, and enduring community ties are deeply evident to all who know them." Athey Decl., Ex. K.

- Dr. Parham Naghdechi, who met the Araghis as high-school seniors in 1989, wrote that the Araghis cared for his wife when she was going through painful cancer treatments. "She was in agony, and Matthew and Michael stepped in without hesitation. They treated her with such tenderness and skill, and they never asked for payment or recognition. They just wanted to help ease her suffering—because that's who they are." Athey Decl., at Ex. F.
- Dr. Matthew Szkalak is a licensed Physical Therapist who has known the Araghis for 12 years and, for the last 5 years, has run his physical therapy practice next door to the Araghis, during which time they have treated mutual patients. He writes that, "Professionally, their compassion, wisdom and empathy for their own and our mutual patients has impacted numerous patients of varying ages. They have consistently exhibited values and character that stand out as both friends and healthcare professionals." Athey Decl., Ex. L.
- Michael Araghi's long-time friend, Arye Sasson, described him as "one of the most selfless and generous people I know. He gives of himself without hesitation, whether it's time, resources, or care. Together, he and I have volunteered to coach our boys' basketball team and referee local

youth soccer games. He never seeks credit; he simply shows up." Athey Decl., at Ex. H.

- Matthew Araghi's friend Peter Mehrian described how Matthew was there for him during a difficult time in his life, calling many times a day to offer encouragement and stopping by to check on him. Mr. Mehrian said that Matthew "was there for me more consistently, more thoughtfully, and more generously than anyone else in my life during that time. That speaks volumes about his heart and character." Athey Decl., at Ex. M.

**<u>Support For Their Family</u>** -- other letters of support describe the irreplaceable role the Araghis play in the lives of their family.

- Matthew Araghi's friend, Peter Mehrian, said "[what] has always stood out to me is how completely and consistently Matthew puts his family first" and how he would always give his kids breakfast and take them to school. "He is hands-on in every sense-cooking, grocery shopping, helping with homework, reading with the kids, and showing up with love and consistency in a way that few people do. His devotion is not performative. It's who he is at his core." Athey Decl., at Ex. M.
- Sydney Wiseman described how Michael Araghi and his family "welcomed me to live at their home as a guest when I first arrived in Los Angeles, no questions asked, and treated me with such unwavering love and care that I came to refer to Michael affectionately as my 'LA Dad.' " Athey Decl., at Ex. D.
- Jeyli Castanon came to the United States when she was 15. She started babysitting for Matthew Araghi's family on weekends to make a little extra money while going to high school. As she explained:

> What struck me immediately was the way they treated me. In a world that often felt cold and indifferent, they were warm. They cared. They always asked if I had eaten, and if I hadn't, they'd insist on sharing whatever food they had. Their kindness made

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

> me feel seen, like I mattered. And they didn't just treat me that way; they treated *everyone* with the same generosity, whether it was their gardener or a guest at the door.

By 16, Jeyli no longer felt safe living with her father, who began charging her rent to sleep in the corner of a garage. But as a minor, she could not continue her immigration process without a guardian. She describes what happened next:

> I went to Matthew and his wife and asked them—humbly and nervously—if I could stay in their guest room. I told them I would work hard to pay whatever I could. What they did next changed my life forever. A week later, they told me I could move in. But not only that—they said they wouldn't charge me a cent. Not for the room. Not for the food. Nothing. The only thing they asked of me was to stay in school and finish high school. I was speechless. In a moment when I felt completely alone in the world, they offered me not just shelter, but unconditional support. Living in their home was more than I ever imagined. I thought I'd just stay quietly in the guest room—but instead, they brought me into their family. I ate at their table. I laughed with their kids. I felt, for the first time in a long time, that I belonged. I wasn't just surviving anymore—I was living, growing, and healing. They didn't owe me anything, but they gave me everything.

Matthew and his wife became Jeyli's legal guardians and shepherded her through the immigration process. She concluded her letter as follows:

> Their love and commitment gave me the strength to keep going. I stayed with them until I graduated from high school in 2022 and moved on to university. Even now, their door is always open to me. I still go back, and every time, they treat me like their own. They still ask if I've eaten. They still care. My story is one of hardship, yes—but also of extraordinary kindness. Of people who stepped in when they didn't have to. Of love that asked for nothing in return. I have worked hard, and I'm proud of how far I've come. But I know I didn't do it alone. I will forever be grateful to Matthew and his family for giving me more than a home. They gave me hope.

Athey Decl., at Ex. N.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

The individual narratives are different, but they paint the same picture. The Araghis are described by people who have known them for decades as kind, gentle men who are devoted to their family, friends, patients, and community. They embody a sense of public service and giving. The Araghis also have a long work history, extensive community involvement, strong family support, no criminal record, pose no threat of future crimes, and have a miniscule recidivism risk (particularly since they have had no offense conduct for more than 5½ years and voluntarily stopped making illegal patient referrals 7½ years ago). These factors support the recommended noncustodial sentence.

**b. The Araghis' Conduct Was Uncharacteristic**

The Araghis do not seek an "aberrant behavior" downward departure pursuant to U.S.S.G. § 5K2.20. But the Court may still consider whether the offense conduct was uncharacteristic for the Araghis in relation to the rest of their lives, consider their life-long history of good moral character, and grant a downward variance to a noncustodial sentence. Other courts have considered such factors in applying a downward variance for what can be viewed as an uncharacteristic episode in an otherwise-commendable life.

- *United States v. Howe*, 543 F.3d 128, 132 (3rd Cir. 2008) -- affirming sentence of probation and temporary home confinement [despite Guideline range of 18-24 months] for wire fraud, where the court found offense to be an "isolated mistake" in an otherwise upstanding life;
- *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) -- affirming District Court's six-level downward variance as reasonable based, in part, on finding that defendant was a "law abiding citizen, who [did] an incredibly dumb thing" and "was not the type of defendant the guidelines section was designed to punish";
- *United States v. Watt*, 707 F.Supp.2d 149, 151 (D. Mass. 2010) -- 24 month sentence [despite Guideline sentence of 60 months] for first-time,

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

white-collar offender involved in massive identity theft ring where millions of victims lost more than $400 million;

- *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) -- upholding sentence of three months [despite Guideline range of 63-78 months] based on defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others."

Letters of support from friends, patients, and family describe how uncharacteristic the offense conduct was for the Araghis and their remorse.

- As their long-time friend Dr. Neghdechi said: "This is why it was so painful and shocking when they confided in me about the case now before you. They were honest with me, from the very beginning. They admitted they had made a serious mistake. I could see how much they regretted it—not just with their words, but in their eyes, their voices, and their broken hearts. They carry the weight of their actions, and I believe they always will." Athey Decl., at Ex. F.
- As their long-time patient, Patrick Lynch said: "I was very surprised when they told me about their situation. I would never have imagined they would be involved in something like that, but they owned up to it 100% and were truly embarrassed to have to tell me the details. I was very happy to write this letter of support because the Michael and Matthew Araghi that I always saw were very nice to all, had great relationships with all their patients, and were always focused on helping people feel better." Athey Decl., at Ex. O.
- As their long-time friend David Khani said: "I believe strongly that the behavior leading to this case was out of character and not a reflection of who they are at their core. Despite the weight of the situation, they've continued to focus on their families, contribute positively to their communities, and show deep respect for the legal process. At no point

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

have I heard them complain about the system or avoid accountability." Athey Decl., at Ex. A.

- As Rabbi Leib described: "I sincerely believe that any errors in judgment were completely out of character and are deeply regretted. They have shown genuine remorse and have already taken steps to accept responsibility and make amends. Their intention is to continue living lives of service and contribution-a path they have walked for many years." Athey Decl., at Ex. K.
- Michael's friend Arye Sasson said he was shocked upon learning about Michael's offense: "It felt completely out of character for someone I have always known as honorable, compassionate, and deeply grounded in doing the right thing. Michael confided in me early on and expressed sincere remorse-both in words and in his demeanor. He knows he made a serious mistake, and he is carrying that with him." Athey Decl., at Ex. H.
- Dr. Szkalak, the Araghis' friend and professional colleague wrote: "I was sad to hear about their current situation and I believe it is not an accurate reflection of who Michael and Matthew are, or how they behave as Chiropractors dedicated to healing human beings and committed to kindness towards all. They have disclosed the unfortunate chain of events and their role to me and the fact that that they have taken complete ownership of their decisions and clearly demonstrate remorse for their actions is testament to their integrity and strength of character." Athey Dec., at Ex. L.
- Michael's ward, Sydney Wiseman offered her view: "To say that Michael's current situation is deeply out of character would be an understatement. He is the definition of a straight arrow—honest, loyal, and community-minded. I truly believe that this is a mistake, an anomaly in a life otherwise defined by integrity and care." Athey Decl., at Ex. D.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

- Michael's wife, Ariane, wrote: "This situation has been devastating to our family—not just because of the legal consequences, but because it is so far from who Michael is at his core. What happened was a mistake. It was wrong, and Michael knows it. I watched him wrestle with it long before the court ever got involved. He confided in me. He felt ashamed, scared, and deeply remorseful. He took steps to stop what he was doing before anyone forced him to. That's the truth." Athey Decl., at Ex. E.

The Araghis stand before the Court humbled by their actions. These testimonials show that this was an uncharacteristic lapse in judgment. The many letters of support submitted by friends and family who have known the Araghis for a lifetime describe men who care deeply about their family, patients, colleagues, and community. Many expressed their shock that people of the Araghis' experience and character would stray from the path, and described this as totally uncharacteristic of who they are. In short, the Araghis were careful, "straight arrows" up until the instant offense. It is respectfully submitted that the Court may consider a lifetime of service and good deeds as productive, law-abiding people who have acknowledged their errors as a counterbalance to this terrible mistake.

**c. The Araghis Realized Their Error, Voluntarily Stopped Making Illegal Referrals, And Have Self-Rehabilitated**

The Araghis illegally referred patients to CC1 from March 2015 until the end of 2017 or early 2018. In late 2017 or early 2018, they stopped.[3] As noted in their statements to the Court, they realized that what they were doing was wrong and did not want to be involved with it anymore. (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32). It is true that, 1½ years later in 2019 -- when the Government sent CC1 back to visit the

[3] The Araghis are not arguing that there is any statute of limitations issue here. Their Plea Agreements identify that offense conduct occurred in November 2019 when they met with CC1 and accepted payments from him for illegal referrals made to him nearly two years or more before. The point is that they never again illegally referred a patient to CC1 or anyone else after late 2017/early 2018.

Araghis undercover with a payment offer -- that they agreed to accept money from CC1 for patients they had referred nearly two years or more before. But they did not refer any new patients to him. What they did was wrong. They know that and have tried to make amends by voluntarily ending their behavior and walking a straight path ever since, which the Court can consider for sentencing purposes.

In fact, the seminal *Gall* case involved the United States Supreme Court upholding the district court's determination that a downward variance was proper where the defendant had "self-rehabilitated" (*Gall*, 552 U.S. at 41) by voluntarily stopping the offense conduct and withdrawing from the conspiracy "after deciding, on his own initiative, to change his life." *Id*. at 57. The Supreme Court found that this lent "strong support to the District Court's conclusion that Gall is not going to return to criminal behavior and is not a danger to society. Compared to a case where the offender's rehabilitation occurred after he was charged with a crime, the District Court here had greater justification for believing Gall's turnaround was genuine, as distinct from a transparent attempt to build a mitigation case." *Id.* Here, the Araghis stopped illegally referring patients nearly two years before they knew there was a Government investigation. That differentiates them from offenders who only "shape up" after they know they are caught.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**d. The Araghis' Heartfelt Remorse About Their Mistakes**

The Court may consider a defendant's remorse as a factor in ordering a below-Guidelines sentence. *See U.S. v. Howe*, 543 F.3d at 134-135 (probationary sentence where District Court found Howe's heartfelt remorse at sentencing along with defendant's devotion to family); *see also United States v. Paul*, 239 F.Appx. 353, 354-355 (9th Cir. 2007) (finding District Court's 16-month sentence for unlawful receipt of federal funding unreasonably high as defendant was first-time offender, returned the funds, and displayed remorse).

The Court has seen confirmation of the Araghis' remorse about their conduct from many supporters. The letters of support all come from people who have

known and interacted with the Araghis for many years. They all say that the Araghis were forthright with them about what they did and demonstrated their remorse and contrition about the mistake they made. *See* Athey Decl., Exs. A, D, E, F, H, I, K, L, O. And the Araghis each wrote a letter to the Court admitting their wrongdoing and expressing their remorse. (Dkt. 26, at ¶ 32; Dkt. 28, at ¶ 32).

The Araghis started life from humble origins. Through hard work and perseverance, they received an education and built a place in a profession that they are proud of. They know that they must now start over again because of their mistakes. They accept that and are willing to meet the challenge. They are not hardened criminals, nor people without respect for the law. Their genuine remorse at what they have done is a factor the Court may consider in imposing the recommended noncustodial sentence.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**2. Need for Sentence to Promote Respect for Law, Provide Just Punishment, Afford Deterrence, Protect the Public, and Provide Needed Correctional Treatment to Defendant [§ 3553(a)(2)]**

**a. The Recommended Noncustodial Sentence Affords Just Punishment While Reflecting Seriousness Of The Offense**

Among other factors, the Court may consider the pre-sentencing impact of an arrest on a defendant's career and job prospects in determining whether the goals of punishment have been adequately met. *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (below-Guidelines sentence where defendant's loss of his business meant sentencing goals of "just punishment" were already met); *United States v. Redemann*, 295 F.Supp.2d 887, 895-97 (E.D. Wis. 2003) (same); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (upholding sentence of probation [despite Guidelines range of 10-16 months] in part because defendant posed no recidivism risk and had already suffered substantially as a result of conviction for filing false tax returns).

Courts may also consider the pre-sentence impact to an entire career when considering the goals of punishment. *See United States v. Samaras*, 390 F.Supp.2d

805, 809 (E.D. Wis. 2005) (below-Guidelines sentence of 18 months [despite Guidelines range of 46-57 months, mostly due to amount of loss] for fraud where court noted in mitigation that defendant was an immigrant who had built an otherwise commendable life, did not devise the scheme or recruit others into it, was not a danger to the public or likely to reoffend, and lost his job due to the conviction, which was "another factor not considered by the guidelines.").

Like the defendants in the above-referenced cases, the Araghis have already experienced a significant amount of punishment from their conduct. They will suffer years (if not decades) of financial hardship through the agreed-upon personal money judgment of forfeiture of nearly $525,000. And they face the very real possibility (if not likelihood) that their professional licenses will be revoked, thus wrecking their livelihoods. As sole breadwinners for their families, this possibility is wrenching. These factors already constitute significant punishment to the Araghis that will resonate more deeply to them than a few months of incarceration.

**b. Specific Deterrence Has Already Occurred As The Araghis Are A Virtually Non-Existent Risk To Re-Offend**

Another § 3553(a)(2) goal is to craft a sentence that protects the public from any potential future crimes by the Araghis. "Specific deterrence" is intended to ensure that the Araghis will not re-offend. The Court may consider many empirical factors in determining the low likelihood that they will re-offend, including:

- *Age* -- Age is a compelling component of recidivism prediction. A study by the Commission on recidivism found that "rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.[4] *See also United States v. Hodges*, 2009 WL 366231, *8 (E.D.N.Y.,

[4] *See* United States Sentencing Commission, "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" (May 2004) (the "USSC Report"), at p. 12 of 38 & Exh. 9 [found at p. 28 of 38], attached as Ex. P to Athey Decl.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Feb. 12, 2009) (court relied, in part, on lower risk of recidivism for 43-year-old defendant). The Araghis are 53 years old.

- *First-Time Offender Status* -- In general, only 15% of male offenders in Criminal History Category I recidivate.[5] *See also United States v. Germosen*, 473 F.Supp.2d 221, 227 (D. Mass. 2007) (citing studies that suggest true first-time offenders have a very low recidivism rate and concluding "[m]inimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism"); *United States v. Cabrera*, 567 F.Supp.2d 271, 279 (D. Mass. 2008) (sentence of 24 months [despite Guidelines range of 70-87 months] in part because defendants "with zero criminal history points are less likely to recidivate than all other offenders"). The PSR determined that the Araghis' criminal history score is zero and their criminal history category is I (Dkt. 26, at ¶¶ 63-64; Dkt. 28, at ¶¶ 63-64).
- *Education*-- Recidivism rates are lowest for defendants with college degrees (8.8%), and even lower for college graduates in Criminal History Category I (7.1%).[6] The Araghis have college degrees and are in Criminal History Category I (with zero criminal history points).
- *Family* -- Recidivism rates are lowest for married defendants (9.8% if offender is in Criminal History Category I).[7] Matthew has been married for 18 years and has three children, all of whom live at home. (Dkt. 28, at ¶ 79). Michael has been married for 21 years and has two children, both of whom live at home. Their brother and sister live within a few miles of

---

[5] Athey Decl., Ex. P, USSC Report at Exh. 9 [found at p. 28 of 38].

[6] Athey Decl., Ex. P, USSC Report at p. 12 of 38 & Exh. 10 [found at p. 29 of 38].

[7] Athey Decl., Ex. P, USSC Report, at Exh. 10 [found at p. 29 of 38].

them, as do their elderly parents. The Araghis are deeply connected to, and have been a stable presence in, their families and religious communities, placing them in the lowest risk category to reoffend.

- *Non-Violent Offenders* -- First-time offenders sentenced under the fraud Guidelines are the least likely to recidivate of any category (9.3%).[8]

The Araghis are 53 year-old, first-time offenders with zero criminal history points, no history of criminal convictions, and are charged with a non-violent offense. They are college graduates who have been employed throughout their adult lives. They have both been married for more than 15 years, have children, and enjoy significant family support. Moreover, the criminal justice system clearly does not view them as significant risks to reoffend. First, Probation recommended at their arraignment that no Pretrial Services supervision was needed (which is unusual) and the Court agreed with Probation's recommendation. Second, Probation recommended both the 2-level reduction for "zero-point offenders" and a downward variance to essentially half of the low end of a Level 15 guideline range. These are all indicators that the Araghis' recidivism threat is not perceived as high.

In imposing the lowest sentence sufficient to protect the public from further crimes by the Araghis, the Court should consider that applying every empirical criteria tracked by the Sentencing Commission, the Araghis' specific characteristics place them at the lowest risk to re-offend. Moreover, as the Supreme Court noted in *Gall*, the Court can consider that the Araghis voluntarily stopped illegally referring patients nearly two years before they knew they were under investigation. And they have not illegally referred a patient in 7½ years. From all of this, the Court can have confidence that "specific deterrence" as to the Araghis has already been achieved. There is no reason to think that the Araghis will ever re-offend, which supports the recommended, below-Guidelines, noncustodial sentence.

[8] Athey Decl., Ex. P, USSC Report, at p. 13 of 38 & Exh. 11 [found at p. 30 of 38].

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### c. Sentencing The Araghis To A Custodial Prison Term Will Not Have A General Deterrence Effect

The final § 3553(a)(2) goal is "general deterrence," namely, discouraging others from committing the same crime through imposition of a significant sentence. But research has shown that there is little statistical correlation between the length of a particular defendant's sentence and general deterrence. *See*, Michael Tonry, "Purposes and Functions of Sentencing," 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects"), attached as Ex. Q to Athey Decl. Instead, it is simply the *fact* of punishment that is known to have a correlative effect on general deterrence. *Id*. at 29-30. In other words, general deterrence is achieved when a criminal justice system investigates and prosecutes crimes so potential offenders know they will be punished if caught. *Id*. at 29. But potential offenders are not deterred by the length of individual sentences because they are generally not aware of penalties for their prospective crimes or do not believe they will be caught and convicted. *Id*.

Another study found that, "[t]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, "Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime," 8 Cardozo J. Conflict Resol. 421, 448-49 (2007), attached as Ex. R to Athey Decl. Balancing the ineffectiveness of general deterrence against the financial costs to society of imprisoning an individual (which, according to the Bureau of Prisons, was $44,090 in FY 2023)[9], may also lead a sentencing court to conclude that general deterrence, by itself, is not a good reason for a prison term. *See United States v. Cole*, 622 F.Supp.2d 632, 639-640 (N.D. Ohio 2008) (general deterrence concept suffers from potential economic inefficiencies with court noting impact of

---

[9] *See* "Annual Determination of Average Cost of Incarceration Fee (COIF)" attached as Athey Decl., Ex. S.

incarceration on taxpayers). Esteemed 7th Circuit Judge Richard Posner posited that white-collar criminals are more effectively punished by monetary penalties than by imprisonment. *See Optimal Sentences for White–Collar Criminals,* 17 Am.Crim. L.Rev. 409, 410, 418 (1980) (citing Gary Becker, *Crime and Punishment: An Economic Approach,* 76 J. Pol. Econ. 169 (1968)), attached as Athey Decl., Ex. T.

The Sixth Circuit noted this point in *U.S. v. Musgrave*, 647 Fed.Appx. 529, 533 (6th Cir. 2016), which upheld the district court's downward variance from a Guideline range of 57-71 months to one day of imprisonment (with credit for the day of processing) and 24 months of home confinement. In its findings, the court agreed with the district court's general deterrence assessment that "[t]here is no justice in imposing a sentence merely to make an example out of a defendant." *Id.* Finally, the Ninth Circuit found that general deterrence does not always need to be accomplished through imprisonment. *See U.S. v. Edwards*, 595 F.3d at 1016 (the 9th Circuit held that § 3553(a) "does not require the goal of general deterrence be met through a period of imprisonment" and that a noncustodial sentence is not inconsistent with the Sentencing Reform Act).

It is respectfully submitted that the fact of the Araghis' arrest, prosecution, guilty plea, and felony conviction is what will have a general deterrent effect, and those factors have already been accomplished. Research and case studies suggest that little to no further general deterrence will be achieved by imposing a prison sentence on the Araghis, particularly a sentence amounting to only a few months.

**3. The Kinds of Sentences Available [§ 3553(a)(3)-(5)]**

Congress directed the Sentencing Commission to "insure that the (sentencing) guidelines reflect the general appropriateness of imposing a sentence other than lengthy imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . ." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society . . . ." *See* Publ. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984). The Araghis do not fit the description of the most "violent and serious criminal offenders." Given the non-violent nature of their crime and low likelihood that the Araghis will re-offend, there are compelling reasons for the Court to follow the statutory and Congressional guidance outlined above and impose the recommended noncustodial sentence in order to reserve prison resources for more dangerous criminal offenders.

**4. Avoiding Unwarranted Sentencing Disparities [§ 3553(a)(6)]**

There are two ways for the Court to evaluate how a noncustodial sentence for the Araghis does not create unwarranted sentencing disparities with similarly-situated defendants.

➢ Consistency With Sentencing In Zone B -- If the Court credits the concept that the *practical impact* of Probation's recommended sentence is to view the Araghis as Zone B offenders, then it is instructive to consider how defendants similar to the Araghis in Zone B have been sentenced. According to data from the Commission, offenders received noncustodial sentences in **66% of all cases** with the following characteristics: (i) sentenced between 2016 and 2024, (ii) in the 9th Circuit, (iii) white-collar, fraud offenders whose offense level was calculated using USSG § 2B1.1, (iv) no criminal history, and (v) in Zone B. *See* Athey Decl., ¶ 23.



In other words, **<u>two-thirds of the time</u>**, offenders matching the Araghis' profile who were facing a recommended incarceration length falling within Zone B (as Probation recommends for the Araghis) received a noncustodial sentence.

➢ <u>Consistency With Sentencing Regardless Of Zone</u> -- Even if the Court does not credit the concept that Probation has functionally recommended that the Araghis be treated as Zone B offenders, federal sentencing data still suggests that a noncustodial sentence is appropriate and would not create unwarranted disparities. According to data from the Commission, offenders received noncustodial sentences in **<u>41% of all cases</u>** with the following characteristics: (i) sentenced between 2016 and 2024, (ii) in the 9th Circuit, (iii) white-collar, fraud offenders whose offense level was calculated using USSG § 2B1.1, (iv) no criminal history, and (v) in any Zone. *See* Athey Decl., ¶ 24.

In short, a noncustodial sentence for the Araghis would not be outside any "heartland" of federal sentencing practice regardless of their Zone.

When considering the specifics of the Araghis' case, the Court may also consider sentencing disparities with other offenders within the same case. Here, *neither of the Araghis' two co-conspirators were charged with any crime in connection with the Araghis' cases*. CC1, presumably as a reward for cooperating with the Government in both the longshoreman case and the Araghis' case: (i) received a sentence of six months of probation in the longshoreman fraud case AND (ii) was not charged at all in the Araghis' case. And CC2, whose identity was known to the Government and who personally received a large portion of the illegal referral fees paid by CC1, was not charged at all in the Araghi's case. In other words, the Araghis' two conspirators who were identified by the Government were not charged and will not be incarcerated in this case, meaning it will not create any unwarranted disparities if the Araghis also receive noncustodial sentences.

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

### 5. The Need to Provide Restitution [§ 3553(a)(7)]

Probation determined that restitution is inapplicable in this case. (Dkt. 26, at ¶¶ 121-22; Dkt. 28, at ¶¶ 122-23). However, the Araghis essentially agreed to restitution by agreeing to pay approximately $525,000 as personal money judgments of forfeiture, which is tantamount to the same thing. In fashioning their sentence, the Court can consider the significant financial burden that the Araghis have agreed to undertake, which is far more than the amount of money they realized from their offense since much of the money either went to their partner, CC2 (who is not being charged or asked to repay any money) and other amounts went to pay taxes on the illegal referral fees. This significant personal money judgment of forfeiture is a substantial form of punishment. In fact, Judge Posner suggested that such large financial penalties are a superior way to punish white collar criminals as compared with modest periods of incarceration. *See Optimal Sentences for White–Collar Criminals,* 17 Am.Crim. L.Rev. 409, 410, 418 (1980). Athey Decl., Ex. T.

## C. Additional Sentencing Considerations -- Amount of Loss

The single largest factor contributing to the Araghis' original Level-20 Guideline calculation is the amount of loss, pursuant to U.S.S.G. § 2B1.1(b), which accounts for 12 of 20 levels and significantly skews the calculation.[10] Here, the

[10] This is common in white-collar cases. *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) ("bracket inflation directed by Congress renders the loss guideline fundamentally flawed"); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (sentencing court may "consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence"); *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) ("guidelines provisions for theft and fraud place excessive weight on [amount of loss], attempting - no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes - to assign precise weights to the theft of different dollar amounts…[but amount of loss may be] a relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006) (42 month sentence [despite Guideline of life imprisonment due to amount of loss in $50 million securities fraud] because

Holmes, Athey, Cowan & Mermelstein LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Araghis are only in Zone D because of the amount of loss. Coupled with the fact that their crime was not violent, the Court may consider the directive that "prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society . . . ." *See* Publ. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984).

### D. Additional Sentencing Considerations -- The Modest Fine Recommended By Probation Is Unnecessary Given The Large Personal Money Judgment Of Forfeiture

Probation recommended imposing a fine of $7500 on each Araghi (Dkt. 25; Dkt. 27), which it states is the low end of the Guideline range. (Dkt. 26, at ¶ 106; Dkt. 28, at ¶ 107). However, it is respectfully submitted that a fine is not warranted and will not significantly alter the Araghis' punishment. In other words, that amount is not the "tail that wags the dog," which in this case is the $524,800 that the Araghis agreed to as a personal money judgment of forfeiture. Even if they do not lose their chiropractic licenses (and sole means for earning a living), it will take them years to pay off the personal money judgment of forfeiture. Piling on with even a modest fine accomplishes no further sentencing goal and is unnecessarily punitive.

## V. CONCLUSION

For the reasons stated herein, the Araghis respectfully request that the Court sentence them to a noncustodial sentence (which, in the Court's discretion, might include up to six months of home confinement), three years of Supervised Release, no fine, no restitution, and a personal money judgment of forfeiture in the amount of $262,400 to each of Matthew and Michael Araghi.

---

of "the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

DATED: June 27, 2025

**HOLMES, ATHEY, COWAN & MERMELSTEIN LLP**

By: /s/

MARK MERMELSTEIN

*Attorneys for Defendants*
MATTHEW ARAGHIS and MICHAEL ARAGHI

HOLMES, ATHEY, COWAN & MERMELSTEIN LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017